J-A32041-16

2017 PA Super 226

| | |
|---|---|
| KHAALID AMIR WILSON AND GABRIEL DESHAWN WILSON, CO-ADMINISTRATORS OF THE ESTATE OF TANYA RENEE WILSON, DECEASED<br><br>v.<br><br>U.S. SECURITY ASSOCIATES, INC. AND YVONNE HILLER<br><br>APPEAL OF: U.S. SECURITY ASSOCIATES, INC. | IN THE SUPERIOR COURT OF PENNSYLVANIA<br><br><br><br><br><br><br><br><br><br>No. 12 EDA 2016 |

Appeal from the Judgment Entered November 16, 2015
in the Court of Common Pleas of Philadelphia County
Civil Division at No.: 0971 Oct. Term 2011

| | |
|---|---|
| KHAALID AMIR WILSON AND GABRIEL DESHAWN WILSON, CO-ADMINISTRATORS OF THE ESTATE OF TANYA RENEE WILSON, DECEASED<br><br>Appellants<br><br>v.<br><br>U.S. SECURITY ASSOCIATES, INC. AND YVONNE HILLER<br><br>Appellees | IN THE SUPERIOR COURT OF PENNSYLVANIA<br><br><br><br><br><br><br><br><br><br><br><br>No. 16 EDA 2016 |

Appeal from the Judgment Entered November 16, 2015
in the Court of Common Pleas of Philadelphia County
Civil Division at No.: 0971 Oct. Term 2011

J-A32041-16

| | |
|---|---|
| PAUL MASCIANTONIO, ESQUIRE, ADMINISTRATOR OF THE ESTATE OF LATONYA BROWN, DECEASED<br><br>v.<br><br>U.S. SECURITY ASSOCIATES, INC. AND YVONNE HILLER<br><br>APPEAL OF:  U.S. SECURITY ASSOCIATES, INC. | IN THE SUPERIOR COURT OF PENNSYLVANIA<br><br><br><br><br><br><br><br>No. 26 EDA 2016 |

Appeal from the Judgment Entered November 16, 2015
in the Court of Common Pleas of Philadelphia County
Civil Division at No.: 0653 Dec. Term 2011

| | |
|---|---|
| PAUL MASCIANTONIO, ESQUIRE, ADMINISTRATOR OF THE ESTATE OF LATONYA BROWN, DECEASED<br><br>Appellant<br>v.<br><br>U.S. SECURITY ASSOCIATES, INC. AND YVONNE HILLER<br><br>Appellees | IN THE SUPERIOR COURT OF PENNSYLVANIA<br><br><br><br><br><br><br><br>No. 30 EDA 2016 |

Appeal from the Judgment Entered November 16, 2015
in the Court of Common Pleas of Philadelphia County
Civil Division at No.: 111200653

- 2 -

J-A32041-16

BEFORE: DUBOW, J., RANSOM, J., and PLATT, J.[*]

OPINION BY PLATT, J.:                                    **FILED JULY 18, 2017**

These consolidated appeals arise out of jury verdicts finding civil liability, including punitive damages, against Appellant, U.S. Security Associates, Inc. (USSA), and Yvonne Hiller.[1] USSA provided security guard services under contract at the bakery plant where Hiller, a suspended worker, shot and killed two co-workers, and seriously wounded a third. The underlying complaints asserted Wrongful Death and Survival Acts claims against USSA. The parties challenge various aspects of the verdicts, and assert trial court error in evidentiary and related rulings. USSA raises numerous claims, most notably several challenges to the punitive damages award of thirty-eight-and-a-half million dollars. Appellees[2] generally seek to uphold the verdicts. However, they also challenge the denial of their motion

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Although a named co-defendant in this litigation, Yvonne Hiller, the shooter, did not actually participate in the trial or this appeal. (**See** N.T. Trial, 2/20/15, at 25-27). She is incarcerated, following her conviction for the murders underlying this case. (**See** infra at 8 n.9). For ease of reference, we use "Appellant" to mean USSA only, unless differently specified, or as otherwise reasonably indicated by the context.

[2] Appellees, Khaalid Amir Wilson and Gabriel Deshawn Wilson, are co-administrators of the estate of Tanya Renee Wilson, one of the victims. Paul Masciantonio, Esquire is the administrator of the estate of LaTonya Brown, the other decedent victim. A third victim, Bryant Dalton, was also shot and seriously wounded, but fortunately survived, and testified at trial. He is not a party in this appeal.

- 3 -

to mold the verdict to make USSA liable for pre-shooting "fear and fright" damages.[3]  We affirm in part and reverse in part.

We take the facts of the case from the findings of the trial court which find support in the record, and our independent review of the certified record.  As already noted, this case arises out of the tragic murder of two employees of Kraft Foods Global Inc., and the serious but non-fatal shooting of a third, at the Nabisco bakery plant then operated by Kraft in Northeast Philadelphia.[4]  The three victims were shot by Hiller, a disgruntled co-worker, in the disastrous climax of an ongoing series of disputes.  While the testimony and arguments differ in some material details, the basic facts underlying the case are not in substantial dispute, except as noted.

Yvonne Hiller was a dough maker at the Kraft bakery.  She had continuing disagreements with co-workers Tanya Renee Wilson, LaTonya Brown, and Bryant Dalton, claiming among other things that they threw deer urine on her car, and that they threw toxic chemicals (including pesticides) at her.

_____

[3] In addition to the briefs of the parties, we also have the benefit of several *amicus curiae* briefs.  Barbara R. Axelrod, Esq. provided a brief on behalf of the Pennsylvania Association for Justice.  Nicholas A. Cummins, Esq. provided a brief on behalf of The Pennsylvania Defense Institute.

[4] Appellees settled separately with Kraft, which is not a party in this appeal. (**See** Appellees' Brief, at 8).

On the evening of September 9, 2010, at about 8:30 p.m., Kraft supervisor (in Kraft's terminology, business unit leader) Carl Rivers suspended Hiller for her role in a verbal altercation that evening, including threats, against Ms. Wilson, Ms. Brown, and Mr. Dalton. Mr. Rivers directed senior USSA security officer (and USSA site supervisor), Damon Harris, to escort Hiller while she left the premises.[5]

Mr. Harris parted company with Hiller at the guard shack and left her to return to her car by herself. In fact, contrary to some testimony of Harris, implying that Hiller got directly into her car, (*see* N.T. Trial, 2/18/15 A.M., at 11), she stopped for a few minutes to smoke a cigarette with an acquaintance in the designated smoking area before leaving. (*See* N.T. Trial, 2/23/15 P.M., at 71-73).

The parties dispute whether the failure to escort Hiller all the way to her car was a breach of required procedure under "post orders," the rules set by Kraft for the performance of USSA's services on its premises under the security contract. (N.T. Trial, 2/18/15 A.M., at 94).

Appellees claim it was. Appellant denies any such requirement, even though its designated corporate representative, Michael Donapel, in

---

[5] USSA provided security services at the facility, under contract, since 2003, when it acquired the operation of the previous security contractor, Day & Zimmerman. Mr. Harris had worked at the location since 2000, at first with Day & Zimmerman. Harris testified that he became a USSA supervisor "around about 2004." (N.T. Trial, 2/17/15 P.M., at 14).

deposition testimony, appeared to assume a walkout to the car was the standard procedure for a disciplinary escort. In any event, Hiller proceeded to the parking lot alone. Once she arrived there she got into her car, but instead of leaving the premises, she decided to drive back to the guard station.

Brandishing a .357 Magnum revolver she had retrieved from her car, Hiller confronted the two USSA security guards, and pointed the gun at the junior guard, Marc Bentley. Using forthright street language, she demanded to be let back in. Although Bentley had nine years of experience as a prison guard, he had only been on the Kraft job for a few weeks. He let Hiller in, and fell to the floor. Harris ran out of the guard shack, fell, spraining his ankle, and got back up and began to make his way to a boiler room some seventy feet away. (*See* N.T. Trial, 2/17/15 P.M., at 86; *see also* Trial Court Memorandum in Support of Orders Denying Motions for Post-Trial Relief, 11/16/15, [Trial Court Memorandum], at 1).

About this time, David Ciarlante, a mechanic on a smoke break who knew Hiller as a fellow smoker, noticed her returning to the building after he had seen her previously depart. Ciarlante testified that Harris and Bentley both came running out of the guard shack. They warned him that Hiller had entered the building, with a gun. Ciarlante ran back into the building to warn other employees. He also called Kraft's security supervisor, Ms. Rhonda Mowday, on his two-way radio. Mowday asked Ciarlante to confirm with USSA security that Hiller had re-entered the building and had a gun.

When he did, Mowday told Ciarlante to tell the guards to call 9-1-1.[6] Ciarlante testified that he pursued Hiller and tried to get her to stop. She shot at him and told him to go away. She shot at several other employees as well.

The trial court found that both USSA guards called 9-1-1 (independently) after several minutes, but that neither ever called Kraft management.[7] (**See** Trial Court Memorandum, at 1; **see also** Appellant's brief, at 27; Appellees Brief, at 7).

The parties vigorously disputed the exact timeline and sequence of events, as well as whether the various clocks on the multiple video surveillance tapes were accurately synchronized. There does not appear to have been a definitive resolution of these questions on the evidence or testimony. The trial court states, without citation to the record, that the parties "agree that approximately eight minutes elapsed" from the time beginning with Hiller's re-entry into the guard shack (8:41 P.M.) to her

---

[6] There appears to be a difference of opinion (and testimony) about whether each of the guards had already called 9-1-1 by then on their own.

[7] To the contrary, Kraft Business Unit Leader Jeffrey Smith, on hearing sporadic reports that Hiller had returned to the building with a gun, called the USSA guard shack. He asked if Yvonne Hiller was back on the premises. Bentley said, "Yes." But when Smith asked, "Where is she?" Bentley replied, "I can't talk" and put the phone down. Smith could hear Bentley "almost sobbing," say "I can't believe she pointed a gun at my face[.]" (Deposition of Jeffrey Smith, 2/16/15, at 54-55; **see also id.** at 42-55).

appearance on the third floor surveillance video (8:49 P.M.). (Trial Court Memorandum, at 17). Appellant does **not** agree. (**See** Appellant's Brief, at 72-73) ("The trial court misunderstood the timeline[.]").

At any rate, after gaining entry at gunpoint Hiller proceeded upstairs to the third floor break room where she confronted the three co-workers, and blamed them for losing her job.[8] Then she shot them. She shot at several other employees and missed. A Philadelphia police SWAT team arrived. Using Ciarlante as a guide to the building lay-out, they approached Hiller. She shot at them, too, before they captured and arrested her.[9]

Appellees filed separate complaints, which included claims for punitive damages. The two cases were eventually consolidated.[10] (**See** Order, 5/21/12). Appellant USSA filed preliminary objections. On June 7, 2012, the parties jointly stipulated to the dismissal of the punitive damages count. (**See** Stipulation to Withdraw, 6/07/12). The parties also agreed to strike the words "**reckless, outrageous, intentional and/or wanton**" from the

_____

[8] The surviving victim, Bryant Dalton, testified that Hiller entered the break room and said, "You motherfuckers costing me my job[,]" before shooting. (N.T. Trial, 2/18/15 P.M., at 20).

[9] Heller was convicted for these crimes, sentenced to life imprisonment without parole, and her sentence was affirmed on appeal. (**See Commonwealth v. Hiller**, 93 A.3d 504 (Pa. Super. filed December 9, 2013) (unpublished memorandum), *appeal denied*, 93 A.3d 462 (Pa. 2014)). She remains incarcerated.

[10] Accordingly, for ease of reference, we may refer to Appellees' parallel complaints in the singular.

relevant paragraphs of the complaints "without prejudice as to Defendant, U.S. Security Associates, Inc. only." (**Id.**) (emphasis added).

On the same date, Appellant praeciped the trial court to withdraw its preliminary objections to Appellees' complaints. The praecipe expressly noted that "**[a s]tipulation for dismissal for punitive damages without prejudice has been executed by all parties and will be filed with the [c]ourt.**" (Praecipe to Withdraw Defendant, U.S. Security Associates, Inc.'s Preliminary Objections to Plaintiff's Complaint, 6/07/12) (emphasis added) (capitalization omitted).

On October 31, 2014, over two years later, and four years after the shooting, successor (and present) counsel for Appellees filed a motion for leave to amend to add punitive damages to the plaintiffs' complaint. (**See** Plaintiffs' Motion to Amend the Complaint to Add a Claim for Punitive Damages, 10/31/14) (most capitalization omitted). Appellant opposed the motion. (**See** Response of Defendant U.S. Security Associates, Inc. to Plaintiffs' Motion to Amend Their Complaints to Add a Claim for Punitive Damages, 11/20/14) (most capitalization omitted).

The first trial began on Tuesday, February 17, 2015.[11] On Monday, February 23, 2015, the trial court granted Appellees' October motion to add punitive damages. The trial had already been in progress for almost a week.

---

[11] Appellees' complaints originally included claims against USSA for negligent hiring, training, and supervision of its security guards. However, on
*(Footnote Continued Next Page)*

The parties initially disputed whether Harris called Kraft management. At trial, Mr. Harris testified (again) that he called Carl Rivers, the Kraft supervisor, from the boiler room. On cross-examination, Harris finally conceded that he had lied about calling Rivers, in an effort to protect his job.[12] (*See* N.T. Trial, 2/17/15 P.M., at 98-99). In his testimony, Mr. Rivers denied that Mr. Harris had called him. (*See* N.T. Trial, 2/18/15 A.M., at 89).[13]

The trial court notes that Harris also signed and submitted a false police report (claiming he had called Kraft management), prepared a false Kraft incident report, and testified falsely at both of his pre-trial depositions. (*See* Trial Court Memorandum, at 13).

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

February 13, 2015, the trial court granted USSA's **unopposed** motion *in limine* to preclude any evidence, reference, or testimony regarding negligent hiring or retention of USSA employees. (*See* Order, 2/13/15). Also, USSA counsel denied any claim for comparative negligence. (*See* N.T. Motions *in Limine*, 2/11/15, at 6). Accordingly, the "only" claims at issue on trial were USSA's *respondeat superior* liability for the actions of its security guard employees; Appellees also argued that the USSA guards were improperly trained.

[12] Both Harris and Bentley testified they were still USSA employees at the time of trial.

[13] The trial court found that both USSA security officers eventually called 911, but did not call Kraft management (as provided in the security agreement and the post orders). (*See* Trial Court Memorandum, at 13-14; *see also* Rule 1925(a) Opinion, 2/03/16, at 1).

Of note for other claims in this appeal, at trial Appellees also presented the expert testimony of Bennet Omalu, M.D., of Lodi, California. Dr. Omalu was the chief medical examiner of San Joaquin County, California, the president of Bennet Omalu Pathology, and an associate professor of pathology at the University of California-Davis. (*See* N.T. Trial, 2/20/15 A.M., at 48). The trial court accepted Dr. Omalu "as a qualified expert as a forensic pathologist, a clinical pathologist, and a neuropathologist." (*Id.*). Counsel for Appellant initially objected, but in the end declined to maintain the objection.[14]

Based on his review of the medical records, Dr. Omalu testified about the physiological processes which would have occurred in the victims when confronted by Hiller with her handgun, as well as the physical effects of actually being shot. (*See id.* at 48-96).

On February 26, 2015, the first jury reached a verdict on compensatory damages. It awarded an aggregate amount of $8,020,000 to Appellees.[15] The jury allocated seventy percent of the liability to Hiller and

_____

[14] Defense counsel initially objected to testimony from Dr. Omalu on damages from pre-impact fright of the two deceased victims, as non-recoverable and, accordingly, confusing and misleading to the jury. (*See* N.T. Trial, 2/20/15 A.M., at 24). Nevertheless, counsel later apparently acquiesced and declined to make a final objection to the trial court's acceptance of Dr. Omalu as an expert witness. (*See id.* at 48).

[15] The jury allocated the award as follows: (a) $2,000,000 to the Brown estate under the Survival Act; $600,000 for Ms. Brown's pre-shooting fright resulting from Hiller's assault and USSA's negligence; $2,000,000 to Ms. *(Footnote Continued Next Page)*

- 11 -

thirty percent to USSA. (**See** Jury Verdict Slip, 2/26/15, at 1; **see also** N.T. Trial, 2/26/15, at 34).

However, the first jury could not reach agreement on whether the USSA guards, Bentley and Harris, acted "outrageously," precluding an award for punitive damages. (N.T. Trial, 3/03/15, at 3). The trial court dismissed the jury. (**See id.** at 15).

A second trial began about three weeks later, on March 23, 2015. The issues presented to the second jury were whether the conduct of the security guards was outrageous, and if so, what amount of punitive damages should be awarded. The trial court informed the second jury that a compensatory award had been made by the first jury, but not the amount or any other details. (**See** N.T. Trial, 3/23/15 A.M., at 61).

In the second trial, Appellant wanted to present testimony from Robert M. Toborowsky, M.D., a clinical and forensic psychiatrist,[16] that the acute

_(Footnote Continued)_ _____

Brown's beneficiaries under the Wrongful Death Act; (b) $1,500,000 to the Wilson estate under the Survival Act; $720,000 for Ms. Wilson's pre-shooting fright resulting from Hiller's assault and USSA's negligence; and $1,200,000 to Ms. Wilson's beneficiaries under the Wrongful Death Act. The trial court's explanation for including a special interrogatory on pre-impact (pre-shooting) fear and fright damages may be found in the Trial Court Memorandum, at 20-21. For further discussion of this issue, see this opinion, _infra_ at *52-*55.

[16] Dr. Toborowsky also held a teaching position as a clinical associate professor in the psychiatric department of the Perelman School of Medicine at the University of Pennsylvania, among numerous other professional duties, publications, and recognition.

psychological stress of having a gun pointed at USSA guards Harris and Bentley likely interfered with their judgment and work performance. (***See*** Supplemental Answer to Expert Discovery, 3/20/15).

The trial court did not permit Dr. Toborowsky to testify, ruling that the defense's submission of him as an expert witness was too late. (***See*** Order, 3/24/15 (citing N.T. Hearing, 3/23/15)). However, the trial court did permit Appellant to re-present the testimony of Appellees/plaintiffs' expert witness, Dr. Omalu, (about the physiological effects of having a gun pointed at the victims) in substitution for the precluded testimony of Dr. Toborowsky.

The second jury returned a verdict of $38,512,600.00 in punitive damages against USSA. (***See*** Punitive Damages Jury Verdict Slip, 3/30/15). This made the total award $46,532,600.00, plus interest. (***See*** Trial Worksheet with Attachment, 3/31/15).[17]

The parties filed various post-trial motions. Notably, Appellant filed a motion for post-trial relief, including a motion for judgment notwithstanding the verdict (JNOV) for both trials, and a motion to mold the verdict.[18] The trial court declined both Appellant's request for a JNOV and Appellees'

---

[17] The jury verdict worksheet was prepared and signed by the trial court judge herself. The worksheet combines the results of the two separate jury verdicts.

[18] JNOV is the acronym abbreviation for judgment notwithstanding the verdict, from the Latin-derived name, *judgment non obstante veredicto.*

request to mold the verdict to include "fear and fright" (pre-shooting) damages. These timely cross-appeals followed.[19]

Appellant nominally presents six questions for our review.[20]

_____

[19] Both parties filed timely court-ordered statements of error. The trial court filed an opinion on February 3, 2016, which referenced its Memorandum in Support of Orders Denying Motions for Post-Trial Relief and Granting Petitions for Delay Damages, filed 11/16/15. **See** Pa.R.A.P. 1925.

[20] In an expanded brief, counsel for Appellant proceeds to argue at least twenty-two, if not twenty-nine, claims, subsidiary questions, and various other inter-related issues. (**See** Appellant's Brief, at 12-79). The arguments made are often unduly repetitive, in a meandering sequence which sometimes tracks the six questions presented and sometimes does not. **See** Pa.R.A.P. 2119(a). Some of the twenty-two arguments are "fairly suggested" by the six nominal questions; some are not. Pa.R.A.P. 2116; (**see also** Appellees' Brief at 34, describing "a scattershot of weak factual arguments").

Counsel cites the well-known maxim that an appellate brief containing ten or twelve points raises a presumption that none of them have any merit. (**See** Appellant's Brief, at 15). Nevertheless, counsel proclaims that "[t]his case is an exception that proves the rule." (**Id.**). It does, but not in the way counsel probably intended.

We understand that a zealous advocate can be tempted to include every conceivable argument in an effort to leave no stone unturned. This is especially so in a high-profile case where multi-million dollar verdicts are at stake. Nevertheless, in reality, zealous representation does not require, or even benefit from, such all-inclusive "kitchen sink" advocacy.

To the contrary, the indiscriminate introduction of numerous marginal arguments does not enhance appellate advocacy; it detracts from it. **See J.J. DeLuca Co. Inc. v. Toll Naval Assocs.**, 56 A.3d 402, 410 (Pa. Super. 2012) ("[T]he effectiveness of appellate advocacy may suffer when counsel raises numerous issues, to the point where a presumption arises that there is no merit to any of them.") (citation omitted). This is true even in capital cases:

*(Footnote Continued Next Page)*

1. Is [Appellant] entitled to JNOV in its favor on [Appellees'] claim for punitive damages, where the trial court allowed [Appellees] to add that claim two years after the statute of limitations expired, and halfway through the trial?

2. Is [Appellant] entitled to JNOV on punitive damages, where the conduct of the security officers under all of the circumstances was insufficient as a matter of law to justify imposing punitive damages against the officers, or vicariously against [Appellant]?

3. Is [Appellant] entitled to a new trial on [Appellees'] claim for punitive damages because of multiple trial errors that unfairly prejudiced [Appellant], including refusing to allow [Appellant] to present its expert on [Appellees'] newly-added claim?

_(Footnote Continued)_ ────────────

> [Our Supreme] Court is aware of the felt need to leave no stone unturned when counsel presents a capital appeal. However, we note that the quality of representation is not measured by the number of issues raised. It is not necessary to raise patently unavailing matters in order to ward off fears of a later finding of ineffectiveness; a good attorney will not disguise and thus weaken good points by camouflaging them in a flurry of makeweight issues which clearly have no merit.

***Commonwealth v. Williams***, 581 Pa. 57, 863 A.2d 505, 510 n.5 (2004); ***see Commonwealth v. Robinson***, 581 Pa. 154, 864 A.2d 460, 479 n.28 (2004) ("While we certainly understand the duty of the attorney to be a zealous advocate, we pose that conduct such as what we presently encounter does not advance the interests of the parties and, if anything, is a disservice to the client."); ***United States v. Hart***, 693 F.2d 286, 287 n.1 (3d Cir. 1982) ("Because of the inordinate number of meritless objections pressed on appeal, spotting the one _bona fide_ issue was like finding a needle in a haystack.").

***Commonwealth v. Wright***, 961 A.2d 119, 131 n.7 (Pa. 2008).

4. Is [Appellant] entitled to a remittitur or new trial on [Appellees'] claim for punitive damages because the punitive damages award was shockingly and unconstitutionally excessive, where the punitive damages were [thirty-six] times higher than [Appellant's] portion of the relevant compensatory award, and USSA's conduct was not reprehensible?

5. Is [Appellant] entitled to JNOV on all issues, because even if the jury could have found negligence, which [Appellant] denies, the evidence was inadequate as a matter of law to find causation?

6. Must the compensatory verdicts in favor of [Appellees] be molded to reflect their joint tortfeasor releases?

(Appellant's Brief, at 6).

Appellees restate Appellant's issues (albeit in opposition), and present their cross-appeal issues as follows:[21]

USSA's "JNOV" issues:

1. Did [Appellees] introduce sufficient evidence in the first trial that [Appellant] breached a duty of care that caused the deaths of Wilson and Brown?

2. Did [Appellees] introduce sufficient evidence in the second trial that [Appellant's] conduct was outrageous so as to permit punitive damages?

3. Did the trial court act within its discretion by allowing [Appellees] to amend their complaints to seek punitive damages?

USSA's "new trial" issues:

_____

[21] Appellees present their issues (including their version of Appellant's issues) in somewhat unorthodox fashion. To avoid unnecessary confusion, we reprint all the issues verbatim as reformulated by Appellees/Cross-Appellants, except for bracketed insertions.

4. Did the trial court permissibly decide that [Appellees] need not re[-]prove causation in the second trial, where causation already had been found by the first jury?

5. Did the trial court act permissibly by not informing the second jury about the first jury's compensatory verdict and prophylactic apportionment of liability?

6. Did the trial court act within its discretion by not permitting expert testimony in the second trial from Dr. Toborowsky given the lateness of his identification?

7. Did the trial court act within its discretion when instructing the second jury on [Appellant's] vicarious liability for its employees' misconduct?

USSA's "damages" issues:

8. Did the trial court properly decline to mold the verdict based either on common-law principles or [Appellees'] releases of Kraft?

9. Did the trial court permissibly decline to remit the verdict under due process principles or Pennsylvania law?

[Appellees'] cross-appeal issues:

10. Did the trial court improperly fail to mold the jury's compensatory verdict so that [Appellant] was liable for the award for pre-shooting assault damages?

11. Did the trial court improperly strike correspondence confirming that [Appellant's] insurance covered punitive damages?

(Appellees' Brief, at 4-5).[22]

_____

[22] It bears mentioning that our admonition against multiplication of marginal issues applies to the eleven questions in Appellees' brief as well. (*See supra* at *14 n.20).

Our standard of review from the denial of JNOV is well-settled:

A JNOV can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. When reviewing a trial court's denial of a motion for JNOV, we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict. In so doing, we must also view this evidence in the light most favorable to the verdict winner, giving the victorious party the benefit of every reasonable inference arising from the evidence and rejecting all unfavorable testimony and inference. Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact. If any basis exists upon which the jury could have properly made its award, then we must affirm the trial court's denial of the motion for JNOV. A JNOV should be entered only in a clear case.

***Am. Future Sys., Inc. v. Better Bus. Bureau of E. Pa.,*** 872 A.2d 1202, 1215 (Pa. Super. 2005) (citation omitted), *affirmed,* 923 A.2d 389 (Pa. 2007), *cert. denied*, 552 U.S. 1076 (2007). Similarly,

Appellate review of a denial of JNOV is quite narrow. We may reverse only in the event the trial court abused its discretion or committed an error of law that controlled the outcome of the case. Abuse of discretion occurs if the trial court renders a judgment that is manifestly unreasonable, arbitrary or capricious; that fails to apply the law; or that is motivated by partiality, prejudice, bias or [i]ll-will.

When reviewing an appeal from the denial of a request for judgment n.o.v., the appellate court must view the evidence in the light most favorable to the verdict[-]winner and give him or her the benefit of every reasonable inference arising therefrom while rejecting all unfavorable testimony and inferences . . . . Thus, the grant of a judgment n.o.v. should only be entered in a clear case and any doubts must be resolved in favor of the verdict[-]winner. Furthermore, [i]t is only when either the

- 18 -

movant is entitled to judgment as a matter of law or the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant that an appellate court may vacate a jury's finding.

*Thomas Jefferson Univ. v. Wapner*, 903 A.2d 565, 569 (Pa. Super. 2006) (citations and internal quotation marks omitted). For our review, we accept the trial court's findings of fact which are supported by the record.[23]

It is well-established that parties, by stipulation, may bind themselves on all matters **except those affecting jurisdiction and prerogatives of the court**. When interpreting a stipulation, courts employ the rules for construction of contracts, with the primary focus placed on ascertaining and giving effect to the intention of the parties. The language of a stipulation, like that of a contract, is construed against the drafter. In construing a stipulation, the court will adopt the interpretation that is the most reasonable and probable, bearing in mind the objects which the parties intended to accomplish through the agreement. The court will not extend the language by implication or enlarge the meaning of terms beyond what is expressed.

---

[23] However, we may not defer to the trial court's findings of fact which rely solely on the allegations of Appellees' complaints. (**See, e.g.**, Trial Court Memorandum, at 1-2). "Allegations are not evidence[.]" **Commonwealth v. Delbridge**, 859 A.2d 1254, 1258 (Pa. 2004). Without evidence there is no proof. **See, e.g.**, **Francis Gerard Janson, P.C. v. Frost**, 618 A.2d 1003, 1006 (Pa. Super. 1993) (appellees had no proof without evidence). "**Where the evidence is insufficient to sustain the verdict or decision of the trial court, the remedy granted in civil cases is a judgment notwithstanding the verdict**." **Lanning v. West**, 803 A.2d 753, 759 (Pa. Super. 2002) (citing **Lilley v. Johns-Manville Corp.,** 596 A.2d 203, 206 (Pa. Super. 1991), *appeal denied,* 607 A.2d 254 (Pa. 1992) (emphasis added).

***Cobbs v. Allied Chem. Corp.***, 661 A.2d 1375, 1377 (Pa. Super. 1995), *appeal denied*, 672 A.2d 303 (Pa. 1996) (citations and footnote omitted) (emphasis added).

In this appeal, Appellant's first issue asserts that the trial court erred and abused its discretion in allowing an amendment to the complaint, after the statute of limitations had expired, to add a claim for punitive damages in the middle of the first trial, notwithstanding the "without prejudice" stipulation of the parties, to its prejudice. (***See*** Appellant's Brief, at 12, 15-25, and *passim*). We agree.

Our review of this issue is guided by the following legal principles:

"Amendments to pleadings are freely allowed under the Pennsylvania Rules of Civil Procedure and it is within the trial court's discretion whether to grant or deny permission to amend. An amendment, however, **may not introduce a new cause of action after the applicable statute of limitations has run**." ***Beckner v. Copeland Corp.***, 785 A.2d 1003, 1005 (Pa. Super. 2001), *appeal denied*, 805 A.2d 518 (Pa. 2002) (citations omitted) (emphasis added).

Here, Appellees maintain that a party may amend a pleading at any time. (***See*** Appellees' Brief, at 36). They cite, *inter alia*, ***Daley v. John Wanamaker, Inc.***, 464 A.2d 355, 361 (Pa. Super. 1983). Nonetheless, the ***Daley*** court recognized that "[a]mendments to pleadings are freely allowed under the Rules of Civil Procedure. However, **an amendment may not**

**introduce a new cause of action after the statute of limitations has run**. The reason for this rule is to prevent prejudice to the adverse party." *Id.* at 361 (emphasis added) (citations and footnote omitted).

On independent review, we are constrained to conclude that the trial court's decision to permit the addition of a claim for punitive damages in the middle of the first trial was legally incorrect. Quite plainly, and without factual dispute, the statute of limitations had expired.

Nevertheless, Appellees, tracking the reasoning of the trial court, maintain that reinstatement of the punitive damages claim was not a new cause of action, but merely a revival of an element of damages incident to an existing cause of action. (*See* Appellees' Brief, at 43) (citing Trial Court Memorandum, 11/16/15, at 52-53). We disagree.

> Appellant submits that her proposed amendments to her [c]omplaint would "amplify" and "specifically detail the original causes of action" **while also adding a clause seeking punitive damages**. These allegations, however, maintain that Appellees acted with "reckless indifference" to the life of Appellant's son and made active "misrepresentations" concerning the program content of [Appellee] to Appellant and the staff of the facility where he was staying prior to his transfer. **Such allegations differ greatly from those contained in her [c]omplaint which do no more than allege ordinary negligence.** We do not agree that these amendments will act merely as an amplification of the claims Appellant has already made against Appellees, for which we have judged them to be immune. Rather, Appellant is seeking to allege facts which would . . . add another measure of damages.

*Willett v. Evergreen Homes, Inc.*, 595 A.2d 164, 168–69 (Pa. Super. 1991), *appeal denied*, 600 A.2d 539 (Pa. 1991) (emphases added).

- 21 -

> Although amendments to pleadings are freely allowed, an amendment may not introduce a new cause of action after the statute of limitations has run because such may cause prejudice to an adverse party. "A new cause of action does arise . . . if the amendment proposes a different theory or a different kind of negligence than the one previously raised or if the operative facts supporting the claim are changed." **Daley** [**supra** at] 361[.]

**Id.** at 169 (two citations omitted).

In this case, in a self-evident *quid pro quo*, the parties, through previous counsel, agreed to the withdrawal of Appellant's preliminary objections to Appellees' complaints in exchange for the withdrawal of their punitive damages claim. Counsel **jointly** stipulated that the words, "reckless, outrageous, intentional and/or wanton," in paragraph 104 of Plaintiffs' complaint, "are stricken without prejudice as to Defendant, U.S. Security Associates, Inc. only." (Stipulation to Withdraw Specific Allegations in Plaintiff's Complaint, 6/07/12). We remain mindful that:

> In construing a stipulation, the court will adopt the interpretation that is the most reasonable and probable, bearing in mind the objects which the parties intended to accomplish through the agreement. The court will not extend the language by implication or enlarge the meaning of terms beyond what is expressed.

**Cobbs**, **supra** at 1377 (citations and footnote omitted).

Two years after the stipulation in this case, Appellees' new counsel sought to introduce an amendment to their complaint, adding a claim for punitive damages. An amendment, however, may not introduce a new

- 22 -

cause of action after the applicable statute of limitations has run. *See Beckner*, *supra* at 1005; *Daley*, *supra* at 361; *Willett*, *supra* at 169.

It is certainly true that the stipulation was "without prejudice." However, it is well-settled that a party which takes a voluntary non-suit even without prejudice must still re-file within the statute of limitations.

"[W]hen a plaintiff takes a voluntary nonsuit, it is as if the original suit was never initiated. Logically, since the original complaint is treated as if it never existed, the statute of limitations is not tolled by the filing of a complaint subsequently dismissed without prejudice." *Williams Studio Div. of Photography by Tallas, Inc. v. Nationwide Mut. Fire Ins. Co.*, 550 A.2d 1333, 1335–36 (Pa. Super. 1988), *appeal denied*, 588 A.2d 510 (Pa. 1990) (citation omitted).

In this appeal, we discern no legal basis on which the strategic withdrawal of one significant cause of action, punitive damages, should be treated differently than our settled controlling authority treats the withdrawal of an entire lawsuit. *See Willett*, *supra* at 168–69; *Williams Studio*, *supra* at 1335–36.

Nor does the phrase "without prejudice" mean that Appellees are free to disregard controlling case authority or the rules of civil procedure. "When interpreting a stipulation, courts employ the rules for construction of contracts[.]" *Cobbs*, *supra* at 1377 (citation omitted). Accordingly, absent contemporaneous indication of the intent of the parties to the contrary, we

give the stipulation the benefit of its plain meaning, but no more. Appellees were arguably able to reinstate their punitive damages claim within the limitations period, but not beyond. "The court will not extend the language by implication or enlarge the meaning of terms beyond what is expressed." *Id.* (citation omitted).

Appellees also contend that the reinsertion of punitive damages is merely an amendment to the *ad damnum* clause, incident to an underlying cause of action, rather than the cause of action itself. (*See* Appellees' Brief, at 41) (citing *Hutchison ex rel. Hutchison v. Luddy*, 870 A.2d 766, 772 (Pa. 2005) and *Hilbert v. Roth*, 149 A.2d 648, 652 (Pa. 1959)). We disagree.

First, most noticeably, neither of these two cases addresses the key question at issue here, namely, whether a claim for punitive damages, once voluntarily withdrawn by stipulation of counsel, can be unilaterally reinstated on mere request, after the statute of limitations has run. Nor does either of these cases present legal principles analogous to the issues raised in this appeal.

*Hutchison*, *supra*, was a molestation case involving a Catholic priest and a minor boy. *See id.* at 767. On earlier review, a panel of this Court had reasoned that, because the sexual encounter at issue occurred in a hotel

room, outside of Church premises,[24] the diocese of Altoona-Johnstown and related parties could not, as a matter of law, be liable for punitive damages under the Restatement (Second) of Torts § 317 (1965) [master-servant liability], which the panel majority had read to require the tort to occur on the premises of the master.[25]   ***See Hutchison***, 763 A.2d at 832.   On remand from our Supreme Court, in a complex, and somewhat complicated opinion, the panel in this Court decided that "the cause of action for a practice or pattern was not cognizable as a basis for a claim for punitive damages and section 317 could not support a claim for punitive damages." ***Id.*** at 837–38.

_____

[24] It appears that the statute of limitations had run out on a series of prior encounters in the rectory, or other church property.

[25] Section 317, in pertinent part, provided that:

> A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
>
> (a) the servant
>
> (i) **is upon the premises in possession of the master** or upon which the servant is privileged to enter only as his servant, or
>
> (ii) is using a chattel of the master[.]

Restatement (Second) of Torts § 317(a) (1965) (emphasis added; original emphasis removed).

Our Supreme Court vacated and remanded. Pertinent to the issues for which appeal was granted, it held that "there is no general proscription in law against pursuing punitive damages in the Section 317 context, where the facts so warrant." *Hutchison*, 870 A.2d at 773.

Our Supreme Court explained: "[W]e reject the Superior Court's conclusion that punitive damages are unavailable, as a matter of law, in an action for negligent supervision. We remand the matter to the Superior Court to determine whether the jury's award of punitive damages against the [d]iocesan [p]arties was properly supported by the evidence." *Id.* [26]

Therefore, aside from the recital of general principles not substantively at issue here, the holding in *Hutchison* on its face does not address the issue of reinstatement of a previously **withdrawn claim** for punitive damages, past the expiration of the statute of limitations.

_____

[26] The Court further explained:

> In overturning the jury award of punitive damages in this case, the Superior Court panel did not view the question before it as requiring application of the settled punitive damages standard to the facts of the case. Instead, the panel concluded that, since the **cause of action** for negligent supervision may succeed upon a showing of ordinary negligence, and an award of punitive damages requires far more than ordinary negligence, negligent supervision causes of action can **never** be the basis for an award of punitive damages. In so holding, the panel conflated theories of liability with the distinct issue of damages, misconstrued this Court's precedent, and thereby committed an error of law.

*Hutchison*, *supra* at 772 (emphases in original).

- 26 -

Appellees' reliance on *Hilbert* is also misplaced. We begin by noting that *Hilbert*, a case principally involving contribution among joint tortfeasors, has long since been superseded by statute. *See Baker v. AC&S, Inc.*, 729 A.2d 1140, 1147 (Pa. Super. 1999) (*en banc*), *affirmed sub nom. Baker v. ACandS*, 755 A.2d 664 (Pa. 2000).

In any event, in *Hilbert*, our High Court **denied** punitive damages from a second tortfeasor to the claimant, who had already settled in full with the first tortfeasor under then-applicable law. The case does contain the exact phrase Appellees want for their argument, ("The right to punitive damages is a mere incident to a cause of action—an element which the jury may consider in making its determination—and not the subject of an action in itself."). *Hilbert*, *supra* at 652 (citations omitted). Nevertheless, in full context, the actual holding in *Hilbert* offers scant support for Appellees' claim in this appeal. The Supreme Court decided that because the compensatory damages claim was not available, the punitive damages claim failed: "Hence, since plaintiff no longer has a cause of action of which **his claim for punitive damages** may be an element, that claim **must fail**." *Id.* at 652 (emphases added).

The **denial** of punitive damages, because the predicate tort is no longer a viable cause of action, is the functional opposite of the claims at issue in this appeal. We discern no basis for extending the holding in *Hilbert* to support the opposite result.

Accordingly, we conclude that the introduction of a claim for punitive damages, particularly after it had been previously withdrawn, improperly added a new cause of action after the statute of limitations had run. Appellees' arguments (and those of the trial court) to the contrary are unpersuasive. We are constrained to conclude that the trial court erred in granting the amendment.[27]

_____

[27] Furthermore, for clarity and completeness, we are constrained to conclude that the grant of permission to add a punitive damages claim after the limitations period had expired was also an abuse of discretion. "When interpreting a stipulation, courts employ the rules for construction of contracts[.]" **Cobbs**, *supra* at 1377 (citation omitted). Here, the trial court deprived Appellant of the benefit of the bargain (elimination of the punitive damages claim) for withdrawing its preliminary objections to the complaint in exchange for the removal of the outrageous conduct allegations. So Appellant lost the benefit of its concession while Appellees gained a new cause of action with no additional cost or risk (save the burden of proof). Depriving Appellant of the benefit of the bargain, while preserving (if not enhancing) the benefit to Appellees, was a *de facto* act of partiality to Appellees, even if unintentional. Finally, again for the sake of completeness, we have no difficulty in concluding that the grant of the order to add a claim for punitive damages in the middle of the trial **prejudiced** Appellant by depriving it of a reasonable opportunity to develop and prepare an appropriate defense. Holding a second trial on the same issue only a few weeks later in such a prolonged, complex, and hard-fought case also prejudiced Appellant's ability to prepare an adequate trial strategy for the new claim. We note that Appellant timely raised the issues of untimeliness and prejudice, and preserved its objection to the punitive damages amendment. (**See** Response of Defendant U.S. Security Associates, Inc. to Plaintiffs' Motion to Amend Their Complaints to Add a Claim for Punitive Damages, 10/20/14, at 11 ¶28; Motion for Post-Trial Relief, 3/09/15, at 3 ¶3, ¶4).

For the same reasons, we are constrained to conclude that the second trial on punitive damages was also in error and an abuse of discretion. Appellant is entitled to a JNOV on the award of punitive damages.

Because we find in favor of Appellant on its first claim, we need not decide its second, third, or fourth claims. They all seek relief from the award of punitive damages, on alternative grounds. (**See** Appellant's Brief, at 6; 25-65).[28] Since we have already granted the relief sought, we need not review the merits of these alternate grounds, *vel non*, and we decline to do so. Similarly, in the interest of judicial economy we decline to review, as moot, the merits of the numerous subsidiary issues raised by Appellant in the second, third, and fourth arguments, whether or not they are fairly suggested by the questions presented.

In its fifth question, Appellant claims that the evidence presented to prove its negligence was "inadequate as a matter of law to find causation[.]" (Appellant's Brief, at 6; **see also id.** at 65-74).[29] It maintains that it is entitled to JNOV "on all issues." (**Id.** at 6).[30] We disagree.

_____

[28] Briefly summarized, Appellant claims that: (a) the security officers' conduct was insufficient as a matter of law to impose punitive damages; (b) it was prejudiced by the trial court's refusal to admit the testimony of its proposed expert witness; and (c) the punitive damages award was shocking and excessive.

[29] In the Statement of Questions Involved, Appellant characterizes the evidence as "inadequate." (Appellant's Brief, at 6). In the Argument section, Appellant calls the evidence "insufficient." (**Id.** at 65).
*(Footnote Continued Next Page)*

Citing **Feld v. Merriam**, 485 A.2d 742, 747 (Pa. 1984),[31] Appellant

postulates that our Supreme Court has ruled that "the standard of care

*(Footnote Continued)* _____

[30] For preservation of its causation issues on appeal, Appellant presumably relies on the first claim asserted in its Rule 1925(b) statement of errors. (**See** Pa.R.A.P. Rule 1925(b) Statement, 1/22/16, at 2). The claim is merely a generalized boilerplate assertion denying "that any claimed breach was a legal cause of the harm[.]" (**Id.**). If this were all we had, we would find all causation claims waived for vagueness. However, the trial court responded to the claim with a considered analysis of the breach of duty claims. Appellant adopts the trial court's framework on appeal. Because the trial court's analysis enables meaningful review, we give Appellant the benefit of the doubt, and we decline to find waiver.

However, it also bears noting for completeness and clarity that a statement of errors which incorporates by reference motions previously filed in the trial court, as Appellant does here, is not a proper Rule 1925 statement. **See Commonwealth v. Osteen**, 552 A.2d 1124, 1126 (Pa. Super. 1989) ("incorporation by reference of appellant's Motion for Reconsideration of Sentence in the purported Pa.R.A.P. 1925(b) statements failed to comply with the letter or spirit of Pa.R.A.P. 1925(b)"); **see also Commonwealth v. Rodgers**, 605 A.2d 1228, 1239 (Pa. Super. 1992), *appeal denied*, 615 A.2d 1311 (Pa. 1992) ("[A]n appellate brief is simply not an appropriate vehicle for the incorporation by reference of matter appearing in previously filed legal documents."). A 1925(b) statement should include a concise statement of each issue to be raised on appeal without reference to other documents. Pennsylvania Rule of Appellate Procedure 1925(b)(4)(ii) provides that: "The Statement shall concisely identify each ruling or error that the appellant intends to challenge with sufficient detail to identify all pertinent issues for the judge." Failure of compliance is a sufficient basis for finding a violation of **Commonwealth v. Lord**, 719 A.2d 306 (Pa. 1998), and its progeny: "Any issues not raised in a 1925(b) statement will be deemed waived." **Id.** at 309; **see also** Pa.R.A.P. 1925(b)(4)(vii): ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived.").

[31] In its brief, Appellant repeatedly mis-cites **Feld** as "48**4** A.2d 742." (**See e.g.**, Appellant's Brief, at iii, 65).

applicable to a private security services company is limited to the express terms and conditions of the contracted-for program of security — no more, no less." (Appellant's Brief, at 65).[32]  Appellant's reliance is misplaced.

Appellant's causation claims challenge the sufficiency of the evidence. *See Kennedy v. Sell*, 816 A.2d 1153, 1159 (Pa. Super. 2003) (holding, *inter alia*, defendant properly challenged sufficiency of plaintiff's evidence of injury by demonstrating lack of causation through evidence of multiple additional unrelated injuries); *Farnese v. SEPTA*, 487 A.2d 887, 889-90 (Pa. Super. 1985) (bus passenger's evidence of general rough street conditions insufficient for jury to infer City of Philadelphia's road work causally created accident, jolt, and injury).

"When reviewing the sufficiency of the evidence . . . this Court must determine whether the evidence and all reasonable inferences therefrom,

---

[32] In the brief, Appellant adds a bald citation to *Kerns v. Methodist Hosp.*, 574 A.2d 1068 (Pa. Super. 1990), with no further discussion.  (*See* Appellant's Brief, at 65).  In *Kerns*, a pizza delivery man injured in an armed robbery by unknown assailants sued a hospital/landlord (of a nurses' residence) and its private security firm, based on a theory of negligent undertaking to provide adequate security.  Quoting *Feld*, this Court reasoned that if the landlord/hospital offered a program of security (through the engagement of the security firm) to the tenants of its nurses' residence and their invitees, (as it indisputably did), "the Hospital and the Security Firm had a **duty to exercise reasonable care** with respect to that program of security."  *Kerns*, *supra* at 1077 (emphasis added).  In other words, while the law does not mandate the establishment of, or a particular level of, security service, once a party undertakes to provide security, it must do so with reasonable care.  Nevertheless, in *Kerns*, **finding no evidence of negligence**, this Court affirmed summary judgment in favor of the hospital and the security firm.  *See id.* at 1078 (citing *Feld*, *supra* at 747).

viewed in the light most favorable to the verdict winner, was sufficient to enable the factfinder to find against the losing party." ***Zeffiro v. Gillen***, 788 A.2d 1009, 1013 (Pa. Super. 2001) (citation omitted). We also remain mindful of the standard of review for a motion for JNOV, as previously noted. ***See Thomas Jefferson Univ.***, ***supra*** at 569 (evidence viewed in light most favorable to verdict-winner, with benefit of every reasonable inference; all unfavorable testimony and inferences rejected); ***see also Am. Future Sys.***, ***supra*** at 1215.

Here, in a meandering argument which jumps back and forth between claims of *de facto* compliance and denials of causation despite non-compliance, (at the expense of developing meaningful support for any of the issues), Appellant presents three main points challenging the sufficiency of the evidence for causation. (***See*** Appellant's Brief, at 65-74).

First, it maintains that the evidence did not establish a definition for "escort services" in the post orders or the other contractual documents.[33] (***See id.*** at 67-68). From the lack of a contractual definition of escort services, and inconsistent evidence on whether the escort procedure

_____

[33] We note on independent review that the supplementary documents to the service agreement between Kraft and USSA mention "escort services" several times, mostly in lists of services which may be provided, and sometimes referring to it as one of the "core responsibilities." (Service Agreement, 8/01/10, Exhibit A, at 10). Nevertheless, the term is never defined, nor are any specific procedures mandated or identified in the constituent documents.

required accompanying Hiller all the way to her car, Appellant posits that there was no breach of duty. In the alternative, Appellant argues that, even assuming there was a breach of duty, that breach was not a legal cause of the murders. (*See id.* at 70-71).

Secondly, Appellant disputes that the guards failed to perform their duty to communicate a "threatening situation" to Kraft management. (*Id.* at 68). It argues here, and repetitively throughout the brief, that Hiller's threatening behavior frightened and panicked the USSA security guards.[34] Even so, Appellant notes, both guards called the police.[35] (*See*, *e.g.*, *id.* at 69). They also told David Ciarlante, the mechanic on a smoke break, that Hiller was back with a gun. (*See* N.T. Trial, 2/23/15, P.M. at 75-76).[36]

Thirdly, Appellant asserts generally that the evidence was insufficient to establish causation "as a matter of law[.]" (*See* Appellant's Brief, at 71). In a brief but still opaque treatment, Appellant argues, in effect, that Appellees failed to meet their burden to prove proximate cause and actual cause, when both are required to prove legal causation. (*See id.* at 70-71).

---

[34] We remain aware, as Appellant repeatedly reminds us, that the USSA guards, by contract, were unarmed.

[35] Apparently, even Hiller also called the police herself. (*See* Statement of Yvonne Hiller to Philadelphia Police Department, 9/09/10, at page 3).

[36] Mr. Ciarlante immediately radioed a warning to Kraft management, and ran back into the building to try to stop Hiller. (*See* N.T. Trial, 2/23/15, P.M. at 77).

It posits that under the substantial factor test, the evidence was insufficient to find causation without impermissible speculation. (*See id.* at 71).

We accept the first argument. However, we conclude there is no merit to either the second or the third claims.

> Proximate causation has been found where wrongful conduct is a substantial factor in bringing about the harm incurred. Proximate causation, which differs from causation-in-fact, is generally a question of law and depends on whether responsibility for the negligent conduct will extend to the harm which in fact occurred. When the harm which ultimately results appears to the court to be a remote and highly extraordinary consequence of the defendant's conduct, legal causation will not be found and liability will not attach.

*Amarhanov v. Fassel*, 658 A.2d 808, 810 (Pa. Super. 1995) (citations omitted). As with all questions of law, our standard of review is *de novo* and our scope of review is plenary. *See In re Wilson*, 879 A.2d 199, 214 (Pa. Super. 2005) (collecting cases).

The relevant law on negligence is extensive, but well-settled:

> In trying to recover for an action in negligence, a party must prove four elements. They are:
>
> 1. A duty or obligation recognized by law.
>
> 2. A breach of the duty.
>
> 3. **Causal connection between the actor's breach of the duty and the resulting injury.**
>
> 4. Actual loss or damage suffered by complainant.
>
> *Reilly v. Tiergarten, Inc.,* 430 Pa. Super. 10, 633 A.2d 208, 210 (1993), [*appeal denied*, 649 A.2d 675 (Pa. 1994)] (emphasis added [in original]).

It is beyond question that the mere existence of negligence and the occurrence of injury are insufficient to impose liability upon anyone as there remains to be proved the link of causation. Furthermore, our Supreme Court has stated that ". . . even when it is established that the defendant breached some duty of care owed the plaintiff, it is incumbent on a plaintiff to establish a causal connection between defendant's conduct, and it must be shown to have been the proximate cause of plaintiff's injury."

Proximate causation is defined as a wrongful act which was a substantial factor in bringing about the plaintiff's harm. Proximate cause does not exist where the causal chain of events resulting in plaintiff's injury is so remote as to appear highly extraordinary that the conduct could have brought about the harm. At issue here is whether or not Appellee's negligence was a "substantial factor" in bringing about Appellant's injuries to satisfy the element of causation.

In order to establish causation, the plaintiff must prove that the breach was both the proximate and actual cause of the injury. Proximate cause is a question of law to be determined by the court before the issue of actual cause may be put to the jury. A determination of legal causation[ ] essentially regards whether the negligence, if any, was so remote that as a matter of law, [the actor] cannot be held legally responsible for [the] harm which subsequently occurred. Therefore, the court must determine whether the injury would have been foreseen by an ordinary person as the natural and probable outcome of the act complained of.

The substantial factor test for determining whether a party's negligence was the proximate or legal cause of another's injury is set forth in **Wisniewski v. Great Atlantic & Pacific Tea Co.,** 226 Pa. Super. 574, 323 A.2d 744, 748 (1974):

This test provides that the actor's negligent conduct is a legal cause of harm to another if:

(a) his conduct is a substantial factor in bringing about the harm, and

      (b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in harm.

[**Id.**] (citing RESTATEMENT (SECOND) OF TORTS, § 431 (1965)).

      The method for determining whether negligent conduct is a substantial factor in producing the injury is set forth in **Willard v. Interpool, Ltd.,** 758 A.2d 684, 688 (Pa. Super. 2000) [, *appeal denied*, 775 A.2d 808 (Pa. 2001)]:

      The following considerations are in themselves or in combination with one another important in determining whether the actor's conduct is a substantial factor in bringing about harm to another:

    (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;

    (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible;

    (c) lapse of time.

[**Id.**] (*citing* RESTATEMENT (SECOND) OF TORTS § 433 (1965)).

**Lux v. Gerald E. Ort Trucking, Inc.**, 887 A.2d 1281, 1286–87 (Pa. Super. 2005), *appeal denied*, 901 A.2d 499 (Pa. 2006) (some citations and internal quotation marks omitted).

For this appeal, we observe preliminarily that Appellant mis-reads the applicability of the decision in **Feld**, **supra** and misstates its holding. (**See** Appellant's Brief, at 65, 68). **Feld** is, at its core, a landlord-tenant case: "The threshold question is whether a landlord has any duty to protect

tenants from the foreseeable criminal acts of third persons, and if so, under what circumstances." *Feld*, *supra* at 745.

Here, Appellant is not a landlord, and the victims were not tenants. Contrary to Appellant's categorical assertion, our Supreme Court in *Feld* has nothing specific to say about the contractual standard of care for a private security services company.[37] (*See* Appellant's Brief, at 65).

In any event, in stark contrast to Appellant's purportedly contract-based "no more, no less" standard of care, (Appellant's Brief, at 65), under both *Feld* and *Kerns*, when a party does offer a program of security, "**he must perform the task in a reasonable manner and where a harm follows a reasonable expectation of that harm, he is liable. The duty is one of reasonable care under the circumstances.**" *Kerns*, *supra* at 1077 (quoting *Feld*, *supra* at 747) (first emphasis added here; second emphasis added in *Kerns*). Under the Restatement (Second) of Torts § 323 (1965),[38] adopted as law in Pennsylvania, (*see Feld*, *supra* at 746–47), one

---

[37] In fact, in *Feld*, the jury found **no liability for the security firm**, leaving no issues about a security firm's duty of care for review on appeal. *See Feld*, *supra* at 745 ("The jury absolved Globe Security of any liability."). The actual holding in *Feld* (for the apartment complex owners) is more analogous to Kraft's situation in this case, not Appellant's.

[38] § **323 Negligent Performance of Undertaking to Render Services**

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical

*(Footnote Continued Next Page)*

who undertakes to render services to another may be held liable for doing so in a negligent fashion;[39] (**see also** Trial Court Memorandum, at 9).[40] As

*(Footnote Continued)* _____

harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323 (1965) (emphasis omitted).

[39] Pertinent to the claims at issue here, the companion section, § 324A, addresses liability to third parties:

**§ 324A Liability to Third Person for Negligent Performance of Undertaking**

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (1965) (most emphasis omitted).

[40] Even Appellant concedes the reasonable care standard, later in the brief. (**See** Appellant's Brief, at 69).

aptly summarized by the trial court, "where a program of security is offered it must be performed in a reasonable manner[.]" (Trial Court Memorandum, at 9).

Applying these principles to the first causation argument (escort service liability), we agree with Appellant that the negligent performance of the escort service was not a legal cause of the murders. There was certainly sufficient evidence for the jury to conclude that Harris was supposed to escort Hiller all the way to her car.[41] However, there is no evidence of record to support the proposition that a failure to provide an escort all the way to Hiller's car was a proximate cause or a substantial factor in the shootings.

We review the evidence in the light most favorable to the Appellees as verdict winners, but we cannot speculate where no evidence exists. The suggested causal link, that a walk all the way to the car would have discouraged or prevented Hiller from returning, is unsupported, speculative, and never rises above mere conjecture. It is too remote to establish legal causation. There was nothing to prevent Hiller from returning on her own. In fact, she did. There is no evidence to establish that a lengthier escort would have made any difference in the ultimate course of events.

_____

[41] Even Harris testified as much. (*See* N.T. Trial, 2/17/15 P.M., at 51 ("Carl [Rivers] said that we're going to — that he needed me to come out and escort Ms. Yvonne, Ms. Hiller, **to her car** because she's being terminated.")) (emphasis added).

Rather, in her statement to the police that night, Hiller confirmed that she originally intended to drive away, but changed her mind. (**See** Statement of Hiller to Police, **supra** at 3) ("I planned on going right home, but I started to think about the fifteen years that I have spent there that somebody was just taking away from me. **I started to drive out, but I turned and went back in**.") (emphasis added).

Therefore, even viewing the evidence in the light most favorable to Appellees, we find nothing in the record to establish that escorting Hiller to her car would have ensured her permanent departure from the property, or prevented her return. (**See** Appellees' Brief, at 6-7, 15-16). Accordingly, there was no evidence that an escort to Hiller's car would have prevented the shootings. We conclude that any breach of escort service procedures was not a proximate or legal cause of the murders. **See Amarhanov**, **supra** at 810.

Nevertheless, the fifth claim merits no relief from the jury's finding of negligence, because Appellant fails to disprove causation in its second and third arguments.

In its second causation–related claim, Appellant asserts that any failure to call Kraft management was not a proximate cause of the shootings. (**See** Appellant's Brief, at 72-74). Abandoning the claim that the guards **did** call Kraft, (disproved at trial), Appellant maintains on appeal that **even if** the guards had called, there was no evidence it would have made "a

bit of difference." (*Id.* at 72; *see also id.* at 73 ("would have made no difference")). We disagree.

Most notably, Appellant disregards our standard of review.[42] Complaining that the trial court opinion does not "fairly depict the evidence," Appellant summarizes its own selected version of the facts. (Appellant's Brief, at 68; *see also id.* at 68-69).[43] Appellant's effort at re-characterization of the evidence fails for two reasons.

First, under both applicable standards of review (for JNOV as well as sufficiency of the evidence), we view the evidence in the light most favorable to the verdict winners, not the Appellant. Secondly, we do not re-weigh the evidence, as Appellant would have us do. To the contrary, we **reject** "all unfavorable testimony and inferences[.]" *Thomas Jefferson Univ.*, *supra* at 569. JNOV is only proper when "no two reasonable minds could disagree

_____

[42] We continue to view the evidence in the light most favorable to the Appellees as verdict winners, together with the benefit of every reasonable inference, and rejecting all unfavorable testimony and inferences. *See Thomas Jefferson Univ.*, *supra* at 569; *Zeffiro*, *supra* at 1013.

[43] Appellant's arguments here, as elsewhere, are repetitive, jumbled, and undeveloped. (*See* Appellant's Brief, at 68-70). Nevertheless, they may be summarized as follows: Harris and Bentley were "frightened and panicked" by Hiller; their fear caused a primitive reaction in the brain; nevertheless, despite the "cascade of physical and chemical changes" in their brains and bodies, the guards satisfied the contract/post order requirement of alternative notice ("get another person's attention") by warning Ciarlante that Hiller was back with a gun; both Harris and Bentley called 911; and the guards cooperated with the police when they arrived. (*Id.* at 69; *see also id.* at 68-70).

that the outcome should have been rendered in favor of the movant," not merely when, as here, Appellant offers an alternative theory of the case. *Id.*

For the same reasons we reject all adverse inferences, even if characterized as causation arguments, *e.g.*, that "[notice] would [not] have made a bit of difference," (Appellant's Brief, at 72); and "[c]alling up to Rivers would certainly have made no difference." (*Id.* at 73).[44] Assertions that taking the actions the guards were supposed to take by contract and post order would not have made any difference are not a disproof of causation. They are speculation and conjecture.

Additionally, contrary to the argument of Appellant, the jury was free to find that the guards' warning of Mr. Ciarlante was **not** the equivalent of giving notice to Kraft management. (**See** Appellant's Brief, at 69) (citing N.T. Trial, 2/23/15, at 90). Notably, neither Bentley nor Harris asked Ciarlante to notify Kraft Management for them. (**See** N.T. Trial, 2/23/15, at 90).[45]

---

[44] Moreover, Appellant's self-serving reformulation of the facts neither disproves negligence nor exonerates the security guards. For one thing it is demonstrably inaccurate. Harris did not "cooperate" with the police. He lied to the police to protect his job. (**See** N.T. Trial, 2/17/15 P.M., at 99). He provided a false written report to the police. He also filed a false report with Kraft. (**See** Trial Court Memorandum, at 13).

[45] It also bears noting that the jury was free to reject the various excuses offered by Harris and Bentley, *e.g.*, that Harris dropped his radio, that
*(Footnote Continued Next Page)*

Appellant's over-arching explanation is that Harris and Bentley failed to perform their duties because they were "frightened and panicked" by Hiller. (Appellant's Brief, at 69). Even assuming for the sake of argument that Appellant's claim is correct, that only explains **why** the guards were negligent. It does not undo their negligence, transform their obvious negligence into minimal compliance, or diminish its tragic consequences.[46]

Because the decision to evacuate rested with Kraft **management**, the first priority of response for the USSA guards was to notify Kraft **management**. Mr. Ciarlante was not Kraft's "representative." (Appellant's Brief, at 69). He was a regular employee who appears to have acted heroically when an emergency situation called for an immediate response.

The jury was free to find on the evidence presented that there was no reason the USSA guards could not or should not have notified Kraft

_(Footnote Continued)_ ──────────────

Bentley gave his radio to Mr. Ciarlante (who testified that he already had his own Kraft-issued radio), that Bentley did not know how to operate the communications equipment, etc. The jury was free to find on the evidence that there was no serious obstacle to either USSA guard notifying Kraft management of the emergency situation directly. There was no need, or particular benefit, in having Ciarlante perform their contractual duties for them.

[46] Moreover, we observe that Appellant's multiple excuses stand in stark contrast to Mr. Ciarlante's spontaneous pro-active response, calling Kraft management (Ms. Mowday) and rushing back into the building to pursue Hiller himself.

management of the emergency situation themselves, not Mr. Ciarlante, saving precious moments when every second counted.

The shootings were foreseeable. Indeed, it was the fear of being shot themselves that prompted the guards to let Hiller re-enter in the first place. There was evidence that the USSA guards had the same two-way radios as Kraft employees, and cell phones.[47] Kraft also maintained landline telephones, and a public address system. Harris and Bentley failed to use any of these communication facilities.

"[W]hen a party offers a program of security, 'he must perform the task in a reasonable manner and where a harm follows a reasonable expectation of that harm, he is liable. The duty is one of reasonable care under the circumstances.'" **Kerns**, **supra** at 1077 (quoting **Feld**, **supra** at 747) (emphasis omitted).

> Proximate cause is a term of art, and may be established by evidence that a defendant's negligent act or failure to act was a substantial factor in bringing about the harm inflicted upon a plaintiff. Pennsylvania law has long recognized that this substantial factor **need not be** . . . **the only factor**, *i. e.*, "that cause which . . . produces the result." A plaintiff need not exclude every possible explanation, and the fact that some other cause concurs with the negligence of the defendant in producing an injury does not relieve defendant from liability unless he can show that such other cause would have produced the injury independently of his negligence.

---

[47] Harris testified that he dropped his radio when he fell while running to the boiler room. He did not go back to retrieve it.

In ***Hamil v. Bashline***, [392 A.2d 1280, 1285 (Pa. 1978)], we noted that Section 323(a) of the Restatement (Second) of Torts (1965) has long been recognized as part of the law of Pennsylvania, and then held that the effect of that section was to relax the degree of certainty ordinarily required of a plaintiff's evidence to provide a basis upon which a jury may find causation:

(O)nce a plaintiff has demonstrated that defendant's acts or omissions, in a situation to which Section 323(a) applies, have increased the risk of harm to another, such evidence furnishes a basis for the fact-finder to go further and find that such increased risk was in turn a substantial factor in bringing about the resultant harm; the necessary proximate case will have been made out if the jury sees fit to find cause in fact.

***Jones v. Montefiore Hosp.***, 431 A.2d 920, 923–24 (Pa. 1981) (some citations omitted).

Viewing the evidence in the light most favorable to the Appellees as verdict winners, we conclude that the jury could properly find that failure to perform the "communication duty," (Appellant's brief, at 68), was a substantial factor, even if not the only factor, and one of the proximate causes of the shootings. The jury could have properly concluded that this failure to communicate an emergency threatening situation was a substantial factor in increasing the risk of harm, setting in operation the sequence of events by which Hiller could proceed unimpeded to the break room, where she shot her victims. ***See Lux***, ***supra*** at 1286–87 (citing ***Willard, supra*** at 688).

We discern no abuse or other error in the finding of the jury and decline to disturb it. Appellant's second causation claim fails.

Finally, we reject, as an incorrect reading of the applicable law, Appellant's generalized third claim—that the evidence was insufficient to establish causation as a matter of law. (**See** Appellant's Brief, at 70-71). In particular, Appellant's reliance on **Eckroth v. Pa. Elec., Inc.**, 12 A.3d 422 (Pa. Super. 2010), *appeal denied*, 21 A.3d 678 (Pa. 2011) is misplaced and unavailing.

In **Eckroth**, a utility shut off electric service for chronic non-payment. **See id.** at 425. Two days later, the utility customer left a lit candle in the bathroom next to highly flammable materials (towels and toilet tissue), on the same shelf, as a night light for family and guests, including several children. Somehow, the candle fell or was knocked over. Four people perished in the resulting fire. This Court concluded that a claim against the utility for the shut-off of electricity two days earlier was too remote to establish legal causation for the fire, finding the nexus between the facts too attenuated. **See id.** at 424-26, 429.

Here, the facts are markedly different. The question of causation at issue is not that USSA withheld security services from Kraft for non-payment of its bills. There was no two-day gap between the cause and the effect. Appellant fails to identify any third party action to establish an intervening cause. In fact, there was no evidence of a superseding cause comparable to the placement of a lit candle in a dangerous location.

Rather, in this case, the jury heard evidence that the guards let Hiller in when she pointed her revolver at one of them. Once she was in, the guards scrambled in different directions. Senior USSA guard Damon Harris admitted that he did not perform his guard duties because he was looking out for himself. At trial he acknowledged that in his deposition he explained away his failure to act by saying, "I got Damon to look after." (N.T. Trial, 2/18/15 A.M., at 18). He conceded that he **hid** in the boiler room until the police arrived. (**See id.** at 19).

The jury could have concluded that once the guards had let her in, reasonable care under the circumstances required that the guards immediately notify Kraft management (not merely a serendipitous passerby) of the threatening emergency situation.

Even assuming (as counsel for Appellees did) that the guards had no practical choice at gunpoint but to let Hiller in,[48] the jury was free to conclude from the evidence that the guards could have and should have notified Kraft management by cell phone, landline telephone, two-way radio, public address system, or some combination of these communications facilities.

_____

[48] (**See** N.T. Trial, 3/30/15, at 15) ("I don't hold them to some Superman standard").

The jury was also free to find from the evidence that they did not do so. We discern no meaningful comparison between the attenuated circumstances in *Eckroth* and the risks of an immediate shooting here. Appellant fails to demonstrate from general legal principles that inaction by its guards did not contribute to the set of circumstances which allowed Hiller to proceed unimpeded with her shooting rampage. Specifically, Appellant fails to prove by implied comparisons to *Eckroth* that there was no legal causation "as a matter of law." We conclude as a matter of law that the jury was free to find that inaction of the USSA guards was "a substantial factor" in contributing to the resultant harm. Therefore, the jury was free to render a verdict that Appellant, through its employees, failed to exercise reasonable care. Appellant's fifth claim fails.

In its sixth, final claim, Appellant argues that the verdict should be molded "in accordance with the joint tortfeasor releases." (Appellant's Brief, at 74 (unnecessary capitalization omitted; *see also id.* at 74-79). We disagree.

Notably, Appellant concedes that "[t]here was no dispute that if USSA had any liability, Hiller and USSA would be **joint tortfeasors**." (Appellant's Brief, at 74) (emphasis added).[49] Appellant argues, in effect, that as a joint

_____

[49] "'[J]oint tort-feasors' means two or more persons jointly or severally liable in tort for the same injury to persons or property, whether or not judgment has been recovered against all or some of them." 42 Pa.C.S.A. § 8322.
*(Footnote Continued Next Page)*

tortfeasor with Hiller it is entitled to benefit from the release executed by Kraft on behalf of itself and its employees.[50]

Appellant acknowledges that it was expressly excluded from the operation of the Kraft settlements. (**See id.** at 76). Nevertheless, it maintains that it is still entitled to a reduction of its liability *pro rata* because in the releases no rights were reserved against Hiller.[51] (**See id.**). Appellant argues that "[t]he only reasonable interpretation of the releases" executed by the Appellees in favor of Kraft, "includes Hiller." (Appellant's Brief, at 75). Appellant posits that "Hiller is among those released" as one of Kraft's "agents[,] servants[, or] employees." (**Id.** at 76). We disagree.

The trial court concluded that, under controlling caselaw, as of September 9, 2010, Hiller's employment with Kraft was terminated. (**See** Trial Court Memorandum, at 24). The court cited **Powell v. Ret. Bd. of Allegheny Cty.**, 246 A.2d 110, 113 (Pa. 1968) (employee who murdered wife **presumed to intend resignation**, despite request for leave of absence, on continued failure to resume employment obligations after reasonable time; employee must demonstrate intention to remain member

*(Footnote Continued)* ―――――――――――――

[50] As previously noted, Kraft settled separately with Appellees. (**See supra** at *4 n.4).

[51] The first jury found that liability for the deaths of LaTonya Brown and Tanya Wilson was 70% attributable to Hiller and 30% attributable to Appellant. (**See** Verdict Slip, 2/26/15).

of labor force), and **Becker v. Butler Cty. Mem'l Hosp.**, 378 A.2d 316, 318 (Pa. Super. 1977) (employee who ignored request to return to work after brief disability **constructively resigned** employment despite employer's failure to comply with administratively prescribed notice procedure). We agree.

Appellant argues, implausibly and with no pertinent citation of support from controlling authority or the evidence of record, that because there was no "continued failure" by Hiller to assume employment obligations after "a reasonable time ha[d] elapsed," she was still a Kraft employee and the Kraft releases applied to her. (Appellant's Brief, at 78).[52] Appellant baldly asserts that both the **Powell** and the **Becker** decisions support its position, rather than that of the trial court (even though both cases conclude that the employment at issue was terminated). (**See id.**). We disagree.

Appellant's undeveloped argument misapprehends the proper standard of review. Questions of employment status are typically addressed to the Commonwealth Court. While decisions of the Commonwealth Court are not binding on this Court, we may elect to follow them if we find the rationale

_____

[52] Although technically suspended, Hiller's own assessment that her job was forfeited is not in doubt. As already noted, when she returned to the break room she told the victims: "You motherfuckers costing me my job[.]" (N.T. Trial, 2/18/15 P.M., at 20). (**See also** Statement of Hiller to Police, **supra** at 3) ("I started to think about the fifteen years that I have spent there that somebody was just taking away from me.").

persuasive. *See Beaston v. Ebersole*, 986 A.2d 876, 881 (Pa. Super. 2009).

Whether an employee voluntarily quit employment is a question of law subject to appellate review as determined from the facts of the individual case. *See Procyson v. Unemployment Comp. Bd. of Review*, 4 A.3d 1124, 1127 (Pa. Commw. 2010). In determining whether an employee had a conscious intention to leave employment, appellate courts consider the **totality of the circumstances** surrounding the incident. *See id.*

Here, we have no hesitancy in determining that in the totality of circumstances, Hiller understood herself not to be an employee of Kraft at the time she shot her victims. Even if she was only technically suspended, she knowingly took actions which irrevocably foreclosed her continued employment. She told the victims she blamed them for the loss of her job. She told the police she understood her fifteen year career to be at an end. Notably, neither in *Powell* nor in *Becker* did the appellant argue that he was no longer employed, as Hiller did here.

Appellant resolutely asserts that there was no "continued failure" of Hiller to perform her employment duties. Nevertheless, it fails to offer a single example of what duty she continued, or could continue, to perform. Appellant's assumption that Hiller intended to murder her co-workers **and** remain a Kraft employee (in flat contradiction of her own acts and

statements) is unsupported by the record and has no basis in the law or the facts. Accordingly, it is frivolous.

Appellant fails to prove it had a claim for contribution from Kraft by virtue of Hiller's continued employment. Appellant's sixth claim fails.

The only claims remaining for review are Appellees' two cross-appeal claims:

> Did the trial court improperly fail to mold the jury's compensatory verdict so that USSA was liable for the award for pre-shooting assault damages?

> Did the trial court improperly strike correspondence confirming that USSA's insurance covered punitive damages?

(Appellees' Brief, at 5).

In their first cross-claim, Appellees challenge the trial court's decision not to mold the verdict to make Appellant liable for pre-impact (pre-shooting) damages. (*See* Appellees' [Cross-Appellants'] Brief, at 89-94). The trial court explains that damages are proper only for conscious pain and suffering from the moment of injury to death. (*See* Trial Court Memorandum, at 22-23) (citing, *inter alia*, ***Nye v. Commonwealth, Dep't of Transp.***, 480 A.2d 318, 321 (Pa. Super. 1984)). We agree.

Appellees argue that the trial court erred by not awarding damages from Appellant for "pre-impact fear and fright." (Appellees' Brief, at 90). We disagree.

> "The rule in Pennsylvania is that in survival actions the measure of damages is the decedent's pain and suffering and loss of gross

earning power **from the date of injury** until death. . . ." **Slaseman v. Myers, supra** [ ], 455 A.2d 1213 at 1217 ([Pa. Super.] 1983) (emphasis added [in original]). Thus, we have always limited recovery to damages for pain and suffering and emotional distress occurring **after** the time of injury.

**Nye**, **supra** at 321 (emphases in original).

Appellees dismiss this statement from **Nye** as *dicta*,[53] but the caselaw they offer as an alternative is not compelling. (**See** Appellees' Brief, at 90-94). They cite **Renk v. City of Pittsburgh**, 641 A.2d 289, 293 (Pa. 1994), a police indemnification case. It appears to be presented primarily if not solely for the proposition, not in dispute here, that civil assault is actionable. (**See** Appellees' Brief, at 90). The principal issue for disposition in **Renk** was whether a police officer could be indemnified under The Political Subdivision Tort Claims Act for a civil judgment for assault, battery, and false imprisonment absent a judicial determination of willful misconduct. Its immediate applicability to the claim in this appeal is not readily apparent.

Appellees also cite **Commonwealth, [Pennsylvania Dep't of Transp.]. v. Phillips**, 488 A.2d 77, 80 (Pa. Commw. 1985), (**see** Appellees' Brief, at 91-92). The abrogation of **Phillips** was recognized in **Osborne v. Cambridge Twp.**, 736 A.2d 715, 722 (Pa. Commw. 1999), *appeal denied*, 759 A.2d 925 (Pa. 2000), *cert. denied*, 531 U.S. 1113 (2001).

_____

[53] The decedent in **Nye** apparently died instantaneously. **See Nye**, **supra** at 321.

Appellees also cite decisions of the Courts of Common Pleas. (*See* Appellees' Brief, at 91-93). "[C]ommon pleas court decisions are not binding on appellate courts." ***U.S. Bank Nat'l Ass'n v. Powers***, 986 A.2d 1231, 1234 n.3 (Pa. Super. 2009) (citing ***Makozy v. Makozy****,* 874 A.2d 1160, 1172 n.7 (Pa. Super. 2005), *appeal denied,* 891 A.2d 733 (Pa. 2005)).

Even the cases otherwise cited by Appellees recognize the limitations correctly observed by the trial court. ***See Amato v. Bell & Gossett***, 116 A.3d 607, 625 (Pa. Super. 2015), *appeal granted in part sub nom.* ***Vinciguerra v. Bayer CropScience Inc.***, 130 A.3d 1283 (Pa. 2016), *appeal dismissed as improvidently granted sub nom.* ***Vinciguerra v. Bayer CropScience Inc.***, 150 A.3d 956 (Pa. 2016) (survival damages are for pain and suffering endured by the decedent **between the time of injury** and death) (cited in Appellees' Brief, at 91); ***Mecca v. Lukasik***, 530 A.2d 1334, 1344 (Pa. Super. 1987) (instruction properly charged jury that damages were compensable "from the **moment of the accident until** the moment of death"). (Appellees' Brief, at 93) (emphases added).

In short, we discern no compelling authority which would require us to disturb the ruling of the trial court. Moreover, as an intermediate court of appellate review, this Court is an "error-correcting court." ***Trach v. Fellin***, 817 A.2d 1102, 1119 (Pa. Super. 2003), *appeal denied sub nom.* ***Trach v. Thrift Drug, Inc.***, 847 A.2d 1288 (Pa. 2004) (citation omitted).

> As an intermediate appellate court, this Court is obligated to follow the precedent set down by our Supreme Court. It is not

the prerogative of an intermediate appellate court to enunciate new precepts of law or to expand existing legal doctrines. Such is a province reserved to the Supreme Court.

*Moses v. T.N.T. Red Star Exp.*, 725 A.2d 792, 801 (Pa. Super. 1999), *appeal denied*, 739 A.2d 1058 (Pa. 1999) (citations omitted). Such a sea change in the computation and award of damages as advocated by Appellees and *amicus* should come from our Supreme Court, or the Legislature.

In Appellees' last issue, they challenge the trial court's striking of correspondence involving the question of insurance coverage for punitive damages. (*See* Appellees' Brief, at 94-95; *see also* Order, 11/16/15).

Briefly, the trial court denied Appellees' efforts to introduce correspondence of counsel involving insurance coverage for punitive damages, as evidence in refutation of Appellant's claim that it was unaware that it could be subject to a large punitive damages verdict.

"Evidence that a person was or was not insured against liability is not admissible to prove whether the person acted negligently or otherwise wrongfully. But the court may admit this evidence for another purpose, such as proving a witness's bias or prejudice or proving agency, ownership, or control." Pennsylvania Rule of Evidence 411. Generally, an appellate court's standard of review of a trial court's evidentiary ruling is whether the trial court abused its discretion. *See Zieber v. Bogert*, 773 A.2d 758, 760 n.3 (Pa. 2001). If the evidentiary ruling at issue turns on a question of law, however, our review is plenary. *See id.*

However, the mootness doctrine requires an actual controversy to exist at all stages of litigation. *See Commonwealth*, *Dep't of Envtl. Prot. v. Cromwell Twp., Huntingdon Cty.,* 32 A.3d 639, 651 (Pa. 2011). In this appeal, because we have decided that a claim for punitive damages improperly added a new cause of action after the statute of limitations had run, the amount of an award for punitive damages is no longer at issue. Accordingly, any issue regarding the admissibility of correspondence referencing insurance coverage for punitive damages is moot.

Although our reasoning differs on occasion from that of the trial court, it is well-settled that we can affirm the trial court's decision on any valid basis, as long as the court came to the correct result. *See Wilson v. Transp. Ins. Co.*, 889 A.2d 563, 577 n.4 (Pa. Super. 2005) (citing, *inter alia*, *Boyer v. Walker,* 714 A.2d 458 (Pa. Super. 1998)).

We reverse the trial court's denial of JNOV as to punitive damages. In all other respects, we affirm the judgment of the trial court.

Judgment affirmed in part and reversed in part.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/18/2017

- 56 -